Nancy M. Olson #260303
nolson@olsonstein.com
David M. Stein #198256
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane No. 301
Newport Beach, CA 92663
Phone: 310.916.7433

*Attorneys for Plaintiff Athletic Nicotine Holdings, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ATHLETIC NICOTINE HOLDINGS, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>        v.<br><br>JASON KRISTOFER, an individual, and LAUREN DYER, an individual,<br><br>                    Defendants. | Case No.: 2:25-cv-8009-_____<br><br>**COMPLAINT FOR:**<br>(1) **Declaratory Relief re Copyright Ownership (28 U.S.C. § 2201);**<br>(2) **Declaratory Relief re Non-Infringement of Copyright (28 U.S.C. § 2201);**<br>(3) **Declaratory Relief re Cancellation of Copyright Registration (28 U.S.C. § 2201)**<br>(4) **Breach of Contract;**<br>(5) **Breach of the Covenant of Good Faith and Fair Dealing**<br>(6) **Negligent Misrepresentation**<br>(7) **Violations Of California Unfair Competition Law Cal. Bus. & Prof. Code § 17200)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Athletic Nicotine Holdings, Inc. brings this action against Defendants Jason Kristofer and Lauren Dyer.

## NATURE OF THIS ACTION

1. This is an action for declaratory relief of copyright ownership and non-

infringement of copyright in the Deliverables created under an Independent Contractor Agreement ("ICA"), the terms of which were offered by Defendants and accepted by Athletic Nicotine (attached as Exhibit 1), and related state law claims.

## THE PARTIES

2. Athletic Nicotine is a Delaware company whose operations are conducted primarily from Los Angeles County in the Central District of California.

3. On information and belief, Jason Kristofer is an individual residing in Bonita Springs, Florida who does business with persons and entities in California, including in this District.

4. On information and belief, Lauren Dyer is an individual residing in Oakland, California who does business with persons and entities in California, including in this District.

## JURISDICTION AND VENUE

5. This is an action for (a) declaratory relief of copyright ownership under 28 U.S.C. § 2201; (b) declaratory relief of non-infringement of copyright under 28 U.S.C. § 2201; (c) declaratory relief of cancellation of copyright registration; (d) breach of contract; (e) breach of the covenant of good faith and fair dealing; (f) negligent misrepresentation; and (g) violations of California Business and Professions Code Section 17200, et seq.

6. This Court has subject matter jurisdiction over the declaratory relief claims under 28 U.S.C. §§ 1331 and 1338 because this action arises under the Copyright Laws of the United States (17 U.S.C. §§ 101 et seq.), and this Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Defendants in that, among other things, Defendants' conduct caused injury to Athletic Nicotine and its intellectual property within the State of California and the Central District of California. Defendants

negotiated the ICA with Athletic Nicotine's CEO, Jason Winn, who at all relevant times resided and worked in this District and was contacted by Defendants via email and Zoom in this District. At all relevant times to the ICA, Defendant Dyer worked and resided in California. A California-based mutual connection introduced Defendants to Plaintiff's CEO.

8. Additionally, Defendant Kristofer (a) regularly does business or solicits business in California, including through his website https://bydefaultcreative.com, which is accessible to California consumers and includes a client list, a majority of which appears to be based in and/or do business in California, including Universal Pictures, Miramax, Interscope, ABC, Fox, and others; (b) derives revenue from customers located in California, including Athletic Nicotine who made payments to him from its California bank account; (c) expects or should reasonably expect his acts to have consequences in California and this District; and (d) derives substantial revenue from interstate commerce.

9. Defendant Dyer (a) regularly does business or solicits business in California, including through her website https://www.linkedin.com/in/ldlaurendyer/, which is accessible to California consumers; (b) derives revenue from customers located in California; (c) expects or should reasonably expect her acts to have consequences in California and this District; and (d) derives substantial revenue from interstate commerce.

10. Venue is appropriate under 28 U.S.C. §§ 1391 and 1400 because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants' actions caused injury in this District.

## GENERAL ALLEGATIONS

11. Athletic Nicotine was founded by Jason Winn (CEO), Chris Motley (COO), and Dan Victor (collectively, "the Founders") in 2023.

12. The Founders created Athletic Nicotine to erase the stigma surrounding synthetic nicotine, and to pioneer an entirely new category of product. Focusing on emerging scientific data concerning the long-term mental, physical, and physiological

1 benefits of low-dose nicotine, the Founders launched Athletic Nicotine to give athletes
2 and other high achievers a sustained performance lift, not just a buzz. This is
3 accomplished through Athletic Nicotine's low-dose, slower release product that is
4 engineered for peak performance and focus. Athletic Nicotine offers the lowest strength
5 nicotine product on the market. High performers, including celebrities and sports
6 personalities, love it because it unlocks performance.

7　　　　13. Athletic Nicotine has no affiliation with Big Tobacco, and unlike other nicotine
8 brands, Athletic Nicotine is online direct-to-consumer. It offers its product to consumers
9 through Shopify. This distribution model has proved wildly successful, with sales
10 growing exponentially over the past two years.

11　　　　14. Athletic Nicotine has taken a proactive approach to defining and protecting its
12 brand and messaging, including by forging an ongoing, long-term relationship with a
13 brand consultant. Athletic Nicotine engaged that brand consultant in 2024 for full website
14 and development services, including a Shopify third-party theme and Shopify store setup.
15 Under the independent contractor agreement with that brand consultant, as with the ICA
16 at issue here, upon receipt of payment, Athletic Nicotine owned the deliverables for all
17 strategy, brand language, and design elements. The services provided under that
18 agreement were deployed before Athletic Nicotine entered the ICA with Defendants. This
19 background provides context for the more limited scope of work Defendants provided
20 (*i.e.*, Athletic Nicotine had a developed brand strategy, website, and Shopify store before
21 entering the ICA).

22　　　　15. In November 2024, a mutual business connection introduced Athletic Nicotine
23 to Defendants so they could explore potential ways to improve Athletic Nicotine's
24 existing digital and creative marketing. After discussing possibly working together,
25 Defendants prepared a Scope of Work Proposal for Athletic Nicotine. That proposal
26 suggested "[a] combination of ongoing retainer support for consistent progress and add-
27 on projects for larger initiative." The Scope of Work presented "Phase 1: Foundation &
28 Strategy (Month 1)" with a list of Deliverables for a flat fee. Next, "Phase 2: Execution&

1　Growth (Ongoing Retainer)" would include a list of other deliverables for an additional
2　flat fee per month for the first 3 months with a "Minimum Commitment: 3 months." The
3　"Total [was] for Jason Kristofer & Lauren Dyer" providing services.

4　　　　16. The parties' discussions, which took place with the CEO and Defendant Dyer
5　in California and Defendant Kristofer in Florida, resulted in the parties entering the ICA,
6　which was drafted by Defendants and electronically signed and accepted by Athletic
7　Nicotine in January 2025 without any edits to Defendants' proposed terms. *See* Ex. 1.
8　Shortly before transmitting the ICA to Athletic Nicotine, Kristofer noted in an email
9　Defendants were "finalizing the Independent Contractor Agreement and will have it over
10　to you shortly. This will outline the scope of work, compensation, and deliverables for
11　our partnership. Looking forward to officially getting this party started!" Kristofer then
12　transmitted the ICA to Athletic Nicotine via email two days later, stating, "Attached is the
13　Independent Contractor Agreement.pdf and should be pretty straightforward outlining
14　everything we discussed. Let us know if there are any questions or changes you wish to
15　address."

16　　　　17. The ICA's Scope of Work listed "Services Provided" for "Phase 1" and "Phase
17　2," as well as "Optional Add-Ons (as requested)." The ICA included a Fees clause that
18　set forth flat fees due for "Phase 1 (Month 1)" and "Phase 2 (Months 2-3)." Payment was
19　due "by the 1st of each month." The "Additional Costs" clause noted that "[a]ny optional
20　add-on projects will be billed separately, based on mutual agreement and scope terms."

21　　　　18. The ICA included an "Ownership of Deliverables" clause that provided "[a]ll
22　creative assets, strategies, and campaign materials produced under this Agreement shall
23　become the exclusive property of the Client [Athletic Nicotine] upon receipt of full
24　payment. Contractors [Defendants] retain the right to showcase work in portfolios or case
25　studies unless otherwise agreed in writing."

26　　　　19. The ICA "may be terminated by either Party with 30 days written notice. Upon
27　termination, Contractors will deliver any completed work and refund any unearned fees,
28　if applicable."　Additionally, "[t]he Client may terminate this Agreement immediately for

cause, including but not limited to failure to deliver agreed-upon services or breach of confidentiality."

20. The written ICA was the "Entire Agreement" and "[a]ny amendments must be made in writing and signed by both Parties."

21. The ICA "shall be governed by the laws of the State of California, without regard to its conflict of laws provisions," further demonstrating Defendants' expectation to face consequences in California.

22. After Athletic Nicotine signed the ICA, the parties began performing under the agreement. In consultation with Athletic Nicotine, Defendant Dyer directed the work to be performed and Defendant Kristofer completed that work, such as changing background colors and other aspects of the Shopify template and creating images and copy associated with Athletic Nicotine's performance marketing strategy. For these services, Athletic Nicotine paid all invoices received by Defendants, which constitutes payment in full as follows.

| Date | Payment | Payee |
|---|---|---|
| January 21, 2025 | Defendant Dyer | $2,500 |
| January 22, 2025 | Defendant Kristofer | $11,500 ($2,500 to be paid to Dyer) |
| February 18, 2025 | Defendant Dyer | $5,000 |
| March 10, 2024 | Defendant Kristofer | $5,000 |
| March 17, 2025 | Defendant Dyer | $5,000 |
| April 4, 2025 | Defendant Kristofer | $5,000 |
| April 4, 2025 | Defendant Dyer | $5,000 |
| April 21, 2025 | Defendant Kristofer | $2,500 |
| May 6, 2025 | Defendant Kristofer | $10,000 |
| May 6, 2025 | Defendant Dyer | $10,000 |

23. After working together for a few months and completing the minimum three-month term proposed in the initial Scope of Work, during a May 23, 2025 meeting initiated by Defendant Dyer, Dyer informed Athletic Nicotine that the ICA was being terminated because she was going in a different direction with her work, including that she would no longer be working with Defendant Kristofer since he was not doing the work he was being asked to do and instead was doing work that had not been requested. Athletic Nicotine understood this to be a termination for cause of the ICA. As of the termination date, there were still three weeks left of the month for which Athletic Nicotine had already paid for services (*i.e.*, May 15 – June 15).

24. In connection with termination of the ICA, Defendant Dyer provided Athletic Nicotine with a document called "Athletic Nicotine Marketing Hand-Off Doc." That document flagged important documents for Athletic Nicotine's files (*e.g.*, Meeting Notes, Revenue/Ad Spending Tracking Sheet, Q1 Business Review + Q2 Plan Deck) and provided credential and contact information for Athletic Nicotine's various ad accounts (*e.g.*, Meta, X, Google). Following termination, Athletic Nicotine had a call with Defendant Kristofer regarding the termination of the scope of work in the ICA and invited Kristofer to send over a new proposal for a minimal scope of work given Dyer's departure. Defendant Kristofer emailed Athletic Nicotine some proposed alternative monthly retainer options, stating he was "around if/when it makes sense to re-engage," acknowledging that the relationship was no longer ongoing.

25. Right after this acknowledgement, despite being within the current invoice period, on May 31, 2025, Sarah Bliss, an individual who identified herself as Defendant Kristofer's accounting point of contact, "sen[t] through the final invoice on Jason's behalf." The email stated that this invoice covered "continued use of brand assets and IP developed during Jason's engagement through the end of May, including: Visual content (homepage, blog, email, social), Klaviyo flows and email layouts; Blog campaign visuals and formatting; Custom iconography; Internal brand frameworks; Messaging currently in use across site and campaigns." The email stated that the invoice was needed to cover

"licensing structure to ensure continued usage is properly covered," and—inconsistent with the Ownership of Deliverables clause in the ICA—it stated that Athletic Nicotine could explore "a full buyout of any messaging or systems for permanent IP transfer."

26. Shocked and surprised to receive this invoice, Athletic Nicotine's CEO, Jason Winn, texted Defendant Kristofer to inquire what the invoice was about asking, "$20K invoice? What have we been paying for. Let's talk when you can." Kristofer responded that he was "[n]ot 100% sure what's in it," but "it's probably tied to usage/IP stuff now that the month's wrapped. Let me check with [accounting] and get clarity." Winn responded that the email from accounting was "a blindside and very strange tone." Kristofer responded further that he "confirmed" it's "all tied to IP and licensing. Clean wrap. Appreciate you closing it out."

27. Winn responded seeking further clarification regarding what the $20K covered; if Kristofer was claiming Athletic Nicotine "owe[d] the additional invoice for IP," Winn explained he'd "never seen this in [his] 20 years of working with agencies/freelancers." Kristofer responded that it covered "licensing/IP tied to the work from Jan-May" since he had been "tracking toward a long-term build," but once "things shifted," now the "invoice just covers usage of the work that came out of that stretch."

28. Contrary to the clear terms of the ICA, Kristofer claimed that "freelancers hold IP" to "protect[] the value if plans ever change[,] [l]ike they did" here. This statement is inconsistent with the ICA, which states no minimum term and provides for termination. Winn responded that the "additional billing is a surprise that [Athletic Nicotine] [was] not aware of, [and it was] never communicated to [Winn]" that Kristofer contemplated such an arrangement or that such payment would be owed.

29. Kristofer responded that this was not "a surprise invoice or anything new," but rather "just the final bill for the branding system we built over that Jan-May stretch." With no support in the ICA or anywhere else, in a complete about face, Kristofer claimed that once Athletic Nicotine terminated the ICA, "[o]nce that changed I held the IP the same way any agency would, to make sure the work holds its value."

30. Winn responded requesting to talk to Kristofer so Winn could try to understand what the prior monthly retainer and additional 11K up front covered, which wasn't full branding that Athletic Nicotine had already done with its branding agency before working with Defendants. He reiterated the new invoice was "definitely a surprise." Kristofer never responded to Winn's request to discuss the invoice. Instead, Kristofer's accounting clerk escalated collections efforts.

31. A few days later, Defendant Kristofer's accounting clerk emailed a revised invoice to Athletic Nicotine's CEO stating that payment was owed for "Licensed brand systems developed between January and May 2025;" "Continued unauthorized use of protected IP since June 2;" and "A 5% late payment penalty, based on the original balance." The email also threatened to initiate copyright infringement litigation against Athletic Nicotine. In a follow-up email sent a few days later, accounting reiterated Kristofer's position that the invoice covered work performed between January and May 2025 and included "enforcement cost recovery and unauthorized use fees through June 18," which was the same day the accounting clerk confirmed everything was removed from the site.

32. Athletic Nicotine's CEO responded that the ICA did not cover "IP fees/licensing rights" and this demand was highly unusual, including the purported automatic late fee of 5% if an invoice is paid a day late. The CEO stated this was "a big surprise and [there was] no mention of ANY IP rights, licensing" etc., especially considering the more than $40,000 already paid under the ICA for January – May 2025 under "the scope and agreement provided by Lauren and Jason [Defendants]."

33. The demand included additional made-up fees such as "Enforcement Cost Recovery fee ($1,500) to cover "administrative, legal and technical preparation required to protect [the] work." Payment of $24,368 was demanded by the next day over the threat of DMCA takedown to AthleticNicotine.com; notification to Shopify, Klaviyo, X.com and Instagram; additional costs for alleged ongoing infringement; and legal enforcement.

34. In the midst of these discussions, as threatened, Defendant Kristofer issued

DMCA takedown notices to Shopify and Namecheap (a domain registrar) as to Athletic Nicotine's Shopify store and website. The Shopify site was removed based on its standard DMCA policy. Athletic Nicotine submitted a counter declaration challenging the removal. Defendant Kristofer also initiated a copyright complaint through Meta. As an online direct-to-consumer company, the Shopify takedown fully crippled Athletic Nicotine and prevented its customers from viewing and purchasing products every day the site was inaccessible.

35. In addition, Defendant Kristofer improperly initiated the process to obtain a copyright registration for the Deliverables owned by Athletic Nicotine under Case No. 1-14940419631.

36. After Defendant Kristofer and his accounting clerk refused to speak by phone to Athletic Nicotine's CEO in the hope of understanding what this dispute was about, the CEO, Jason Winn, expressed frustration to the accounting clerk that the post-ICA demand "feels like extortion of $20k" since Athletic Nicotine had already "paid Jason [Kristofer] for the scope of work which we agreed upon and more." Winn wondered, "What did we pay him over $42K for?" Winn reiterated, "no agreement references [Defendants' ownership of] IP or [an ongoing] licensing that we ever saw or agree to."

37. In an effort to avoid further unwarranted claims by Defendant Kristofer and in hopes of quickly having its business restored, Athletic Nicotine removed from its website all design elements that related to Deliverables provided under the ICA. Following these changes, Defendant Kristofer's accounting clerk wrote to Athletic Nicotine stating, "we've confirmed that remaining assets [allegedly owned by Defendants] have been removed."

38. In response, Athletic Nicotine noted, "[a]s you are aware and have referenced we have removed all content you were associated with. If you agree to remove your complaint and we regain access to our products in Shopify[,] [w]e are willing to come to terms on executing the payment minus the erroneous late fee." But accounting demanded payment before access would be restored for the full amount, including the outlandish late

fee. Reluctant to pay the extortive demand but feeling left with no other choice as its ability to do business was held hostage by these demands, on June 25, 2025, Athletic Nicotine paid the invoice. The next day, its website including the Shopify platform was restored. Although the accounting clerk had stated that they confirmed all objectionable material had been removed, this was not the end of the demands.

39. Despite paying the ransom and making the website revisions, which Athletic Nicotine believed resolved the unwarranted allegations, Defendant Kristofer's shakedown campaign was not over. In August, his accounting clerk emailed yet another invoice to Athletic Nicotine's CEO claiming that further payment was owed for use through August 5, 2025. Winn responded that this request came as "a shock" given the payment history, including the post-ICA June payment that Kristofer had identified as a "clean wrap."

40. On August 18, 2025, Defendant Kristofer once again submitted a DMCA takedown notice to Shopify, this time claiming that Athletic Nicotine's product images somehow infringed Kristofer's alleged IP, even though Kristofer did not create or design Athletic Nicotine's products or any current content relating thereto. These actions completely crippled Athletic Nicotine's ability to do business and Athletic Nicotine once again submitted a counter declaration.

41. To stop this pattern of extortion and unfair business practices, including that Defendant Kristofer is using Athletic Nicotine's logos on his own website without permission, and to ensure that Defendant Kristofer cannot continue holding Athletic Nicotine's business hostage through improper DMCA takedown notices, Athletic Nicotine brings this suit for declarations regarding its rights under the ICA and to hold Defendants accountable for their false copyright claims and related actions.

## FIRST CAUSE OF ACTION

### (Declaratory Relief re Copyright Ownership (28 U.S.C. § 2201))

42. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

COMPLAINT

43. An actual controversy exists as to whether Athletic Nicotine, the Client who owns the Deliverables since all payments were made under the ICA, and not Defendants, owns all, some, or none of the copyright in the Deliverables provided by Defendants and paid for by Athletic Nicotine under the ICA.

44. Athletic Nicotine is entitled to a declaratory judgment that it is the only owner of the copyright of the Deliverables provided by Defendants and paid for by Athletic Nicotine under the ICA.

## SECOND CAUSE OF ACTION

**(Declaratory Relief re Non-Infringement of Copyright (28 U.S.C. § 2201))**

45. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

46. An actual controversy exists as to whether Athletic Nicotine, the Client under the ICA, infringed upon Defendants' copyright by continuing to use any of the Deliverables created, provided, and paid for under the ICA after termination of the ICA.

47. To the extent any aspect of the Deliverables qualifies for copyright protection, Athletic Nicotine is entitled to a declaratory judgment that it does not infringe any alleged copyright of Defendants because Athletic Nicotine owns the Deliverables pursuant to the ICA.

48. To the extent any aspect of the Deliverables lacks the requisite originality or creativity needed to qualify for copyright protection, Athletic Nicotine is entitled to a further declaratory judgment in the alternative that it does not infringe any alleged copyright of Defendants as to any such aspect of the Deliverables.

## THIRD CAUSE OF ACTION

**(Declaratory Relief re Cancellation of Copyright Registration (28 U.S.C. § 2201))**

49. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

50. An actual controversy exists as to the validity of any copyright registration for the Deliverables. After Athletic Nicotine had paid for the Deliverables under the ICA and the ICA had been terminated, in June 2025, Defendant Kristofer advised Athletic Nicotine that he initiated the process to obtain a copyright registration for the Deliverables under Case No. 1-14940419631.

51. The Deliverables belong to Athletic Nicotine under the ICA and Defendants lack any rights in the Deliverables such that they would be eligible to register them for copyright protection. Moreover, copyright protection is available only for creative and original expressions, so to the extent the Deliverables contain non-protectable elements (*e.g.*, the idea of putting a blog or testimonials on a website), Defendants may not register such elements for copyright protection. To the extent Defendants purport that such elements comprise creative or original expression, such statements amount to fraud on the Copyright Office. Accordingly, a declaratory judgment is warranted stating that the application and/or any copyright registration obtained through Case No. 1-14940419631 is canceled, either because Athletic Nicotine owns the Deliverables under the ICA and/or any non-protectable elements contained therein are not eligible for protection in any event.

## FOURTH CAUSE OF ACTION
### Breach of Contract

52. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

53. Athletic Nicotine and Defendants entered into a contract, namely, the ICA, which was drafted by Defendants and mutually consented to by the parties, as evidenced by their objective conduct. The parties demonstrated their intent to be bound by act or omission such as through performance. Cal. Civ. Code §§ 1581, 1584.

54. Athletic Nicotine did all, or substantially all, of the significant things that the contract required it to do, including by making all payments required by the contract.

55. Defendants breached the contract by failing to do something that the contract

required, namely, provide ownership of the Deliverables to Athletic Nicotine upon receipt of payment and refrain from claiming that Defendants retain ownership in the paid-for Deliverables owned by Athletic Nicotine under the ICA, seeking additional extortion payments outside of the ICA, and issuing DMCA takedown notices in an attempt to preclude Athletic Nicotine from using the Deliverables.

56. Athletic Nicotine was damaged and continues to be damaged by Defendants' failure to adhere to the ICA in an amount to be proven at trial.

57. Defendants' breach of the ICA was and is a substantial factor in causing Athletic Nicotine's harm.

## FIFTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

58. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

59. Athletic Nicotine and Defendants entered into a contract, namely, the ICA.

60. Athletic Nicotine did all or substantially all of the significant things that the contract required it to do.

61. All conditions required for Defendants' performance occurred, including that Athletic Nicotine paid all invoices issues by Defendants under the ICA.

62. Defendant Kristofer prevented Athletic Nicotine from receiving the benefits it paid for under the ICA by demanding further payments to continue using the Deliverables paid for under the ICA and issuing DMCA takedown notices to hold the Deliverables hostage until Athletic Nicotine made the additional payments as improperly demanded by Defendant Kristofer.

63. Despite acknowledging the ICA, Defendant Dyer prevented Athletic Nicotine from receiving the benefits it paid for under the ICA by standing idle when Defendant Kristofer began his extortion campaign against Athletic Nicotine rather than affirming the terms of the ICA causing the deliverables for which Defendant Dyer received

payment to be released to Athletic Nicotine as agreed in the ICA.

64. By doing the acts described in the foregoing paragraphs, Defendant Kristofer and Defendant Dyer did not act fairly and in good faith toward Athletic Nicotine.

65. Athletic Nicotine was harmed and continues to be harmed by Defendants' conduct.

### SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against Jason Kristofer)

66. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

67. Defendant Kristofer and/or his accounting clerk working on his behalf made statements to Athletic Nicotine averring that, after the ICA was terminated, Athletic Nicotine continued to owe money to Kristofer for continued use of the Deliverables, no permanent IP transfer had occurred under the ICA, and Athletic Nicotine's website and Shopify store would remain removed under a DMCA takedown notice until Athletic Nicotine made additional payments to Kristofer.

68. Even if Defendant Kristofer believed such representations were true, he had no reasonable grounds for believing the representations were true when he made them, especially where he drafted the ICA, including the Ownership of Deliverables clause.

69. Defendant Kristofer intended that Athletic Nicotine would rely on his representations that Athletic Nicotine's website and Shopify store would not be restored until Athletic Nicotine made additional payments.

70. Athletic Nicotine reasonably relied on Defendant Kristofer's statements in that the Shopify store was taken down because of Kristofer's statements and Athletic Nicotine believed it could not regain access to it without making the requested payment.

71. Athletic Nicotine was harmed by Defendant Kristofer's statements, including

by making an additional payment to Kristofer and losing business every day the site was held hostage due to Kristofer's misrepresentations.

72. Athletic Nicotine's reliance on Defendant Kristofer's representation was a substantial factor in causing harm to Athletic Nicotine.

## SEVENTH CAUSE OF ACTION
## State Unfair Business Practices
## (Cal. Bus. & Prof. Code § 17200)

73. Athletic Nicotine realleges and incorporates by reference all paragraphs above as if fully set forth herein.

74. Defendants committed unlawful, unfair and fraudulent acts and practices under Cal. Bus. & Prof. Code § 17200 by knowingly issuing improper DMCA takedown notices to Shopify as to Athletic Nicotine's product sales website to paralyze Athletic Nicotine's ability to sell its products, and by demanding further payments for the Deliverables after Athletic Nicotine had already provided all agreed payments under the ICA. Defendant Kristofer is also using Athletic Nicotine's trademark and log on his website without permission.

75. Athletic Nicotine has no adequate remedy at law.

76. Defendants' acts and conduct have caused and will continue to cause actual, immediate, and irreparable injury to Athletic Nicotine, including to its business, its goodwill and reputation, and to the public, and will continue to threaten such injury unless enjoined by this Court. But for Defendants' acts and conduct, Athletic Nicotine would not suffer such injury.

77. Pursuant to Cal. Bus. & Prof. Code § 17200, Athletic Nicotine is entitled to an injunction prohibiting Defendants from continuing the practices described above, and restitution of all amounts acquired by Defendants by means of such wrongful acts.

\\\

\\\

# PRAYER FOR RELIEF

**WHEREFORE**, Athletic Nicotine prays for relief as follows:

A. Entry of judgment declaring Athletic Nicotine is the owner of the Deliverables, including any copyrightable aspects thereof;

B. Entry of judgment declaring Athletic Nicotine has not infringed any alleged copyright of Defendants;

C. For an order cancelling the application and/or any resulting copyright registration obtained improperly by Defendants through Copyright Office Case No. 1-14940419631;

D. For an order finding that Defendants' conduct was willful;

E. For an order temporarily, preliminarily and permanently enjoining Defendants, and any affiliates, employees, representatives, attorneys, privies, and all others acting in concert or participation with any of them, from interfering with Athletic Nicotine's ownership in the Deliverables, including by issuing DMCA takedown notices, or otherwise engaging in acts of unfair business practices, including improper trademark use;

F. For an order directing Defendants to reimburse Athletic Nicotine for the improper payments demanded from June 2025 forward for the Deliverables, which were already paid for under the ICA; and to compensate Athletic Nicotine for ongoing lost sales and reputational damage resulting from Defendants' improper conduct;

G. For an order directing Defendants to file with the Court, and serve upon Athletic Nicotine's counsel, within thirty (30) days after entry of the order of injunction, a report setting forth the manner and form in which it has complied with the injunction;

H. For an order awarding Athletic Nicotine damages adequate to compensate it for Defendants acts alleged herein, including disgorgement of profits or gains of any kind made by Defendants from their unlawful acts, in amounts to be fixed by the Court in accordance with proof, including general, statutory, enhanced, exemplary, treble, and/or punitive damages, as appropriate;

I. For an order awarding Athletic Nicotine pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

J. For an order requiring an accounting of the damages to which Athletic Nicotine is found to be entitled;

K. For an order awarding Athletic Nicotine recovery of full costs and reasonable attorney's fees under 17 U.S.C. § 505; and,

L. Granting Athletic Nicotine such other and further relief as the Court may deem just and proper.

Dated: August 25, 2025

/s/ *Nancy M. Olson*
Nancy M. Olson
OLSON STEIN LLP
Attorneys for Plaintiff Athletic Nicotine

## DEMAND FOR JURY TRIAL

Plaintiff Athletic Nicotine demands a jury trial on all matters so triable.

Dated: August 25, 2025

                                          /s/ *Nancy M. Olson*
                                        Nancy M. Olson
                                        OLSON STEIN LLP
                                        Attorneys for Plaintiff Athletic Nicotine